## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ALLIED WORKERS LOCAL NO. 14 PENSION AND HEALTH AND WELFARE FUNDS, individually and on behalf of all others similarly situated,<br><br>                               Plaintiff,<br><br>          v.<br><br>BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS SECURITIES CORP.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE AG; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; FIRST TENNESSEE BANK, N.A.; FTN FINANCIAL SECURITIES CORP.; GOLDMAN SACHS & CO. LLC; JPMORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INC; AND UBS SECURITIES LLC,<br><br>                               Defendants. | Docket No.: 19-cv-2661<br><br><br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff, International Association of Heat and Frost Insulators and Allied Workers Local No. 14 Pension and Health and Welfare Funds ("Plaintiff"), files this action individually and as a class action on behalf of all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure, against Defendants (as defined below) for their violations of law from at least January 1, 2009 through April 27, 2014 ("Class Period"). Based on personal knowledge and information and belief, Plaintiff complains and alleges as follows.

## INTRODUCTION

1.     The U.S. Department of Justice ("DOJ") Antitrust Division has initiated a criminal investigation into price-fixing in the $550 billion secondary market for debt issued by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"), ("FFBs").[1]

2.     Defendants are the largest dealers in both the primary and secondary markets for FFBs.  Defendants sell FFBs to and buy FFBs from investors, such as Plaintiff and members of the Class, in the secondary market.

3.     During the Class Period, Defendants were the dominant Approved FFB Dealers in the primary market for FFBs. Fannie Mae and Freddie Mac issue FFBs (the "FFB Issuance Process")[2] in the primary market to Approved FFB Dealers who, in turn, establish the secondary market for certain FFBs, as discussed below. Therefore, Defendants' position as the dominant dealers in the primary market for FFBs gave them control over the FFB supply that was ultimately available to investors in the secondary market during the Class Period.

4.     The secondary market for FFBs operates as a massive "over-the-counter" market. That is, FFBs do not trade on a national exchange or transparent market. Rather, if an investor, such as Plaintiff, wishes to purchase an FFB, the investor must generally transact directly with an employee (i.e., a salesperson or trader) of an Approved FFB Dealer, such as a Defendant, over a computer network and/or by phone to receive a price quote. Because over-the-counter markets are not transparent and limit or eliminate efficient pricing information from investors, Defendants

---

[1] FFBs are defined as unsecured issuances by Fannie Mae and Freddie Mac, excluding mortgage-backed securities issued by them.

[2] Defendants' dominance of the FFB Issuance Process afforded them a common financial incentive and sufficient control of the FFB supply to fix FFB prices paid by investors in the secondary market. Plaintiff does not allege claims based on price-fixing in the FFB Issuance Process or the primary market.

possessed the ability to collude regarding the pricing of FFBs in the secondary market and, therefore, harm investors.

5.     Empirical, economic price data and other market facts indicate that Defendants used their control over FFB supply to fix the prices of FFBs in the secondary market in which Plaintiff and members of the class participated. As a result of the Defendants' unlawful conduct, Plaintiff and members of the Class paid too much (when purchasing FFBs) and received too little (when selling FFBs) during the Class Period.

6.     Plaintiffs obtained pricing data for over 100 unique FFB CUSIPS and over 1 million FFB transactions. Analysis of FFB price data and other market data suggest highly anomalous FFB pricing during the Class Period when Defendants dominated the primary and secondary markets. Economic analysis of FFBs and other market data is consistent with both the DOJ Antitrust Division's investigation and price-fixing of FFBs in the secondary market in which Defendants traded with Plaintiff and members of the Class during the Class Period.

7.     First, statistical analysis of FFB pricing data shows that the prices Defendants charged investors inflated prices for newly issued FFBs soon after FFB issuances. Consequently, investors like Plaintiff and the Class overpaid for FFBs during the Class Period.

8.     Second, statistical analysis also demonstrates that the price inflation for newly issued FFBs persisted for the five business days after offer days which suggests that prices paid by Plaintiff and the Class were artificially inflated during the Class Period.

9.     The results of the analyses described above indicate that Defendants were responsible for the artificially wide bid-ask spreads quoted to investors, including Plaintiffs, during the Class Period. As a result, rather than competing for FFB transactions with Plaintiff and members of the Class, Defendants agreed to inflate the prices at which they sold FFBs to investors

(the "ask" price), or deflated the price at which they purchased FFBs from investors (the "bid" price), or both.

10.     Defendants' alleged anticompetitive behavior diminished after April 2014 when multiple regulators exercised increased scrutiny over the Defendants' operations in the wake of the LIBOR scandal. That scrutiny included the required implementation of various internal controls designed to deter and reduce widespread anticompetitive conduct among the Defendants, and other banks. During that time, many of the Defendants were also under tremendous scrutiny (both civil and criminal) as a result of alleged manipulation of the foreign exchange ("FX") market in which they participated as dealers.

11.     Defendants are therefore alleged to have colluded to manipulate the prices of FFBs the secondary market in order to extract supra-competitive profits for themselves at the expense of Plaintiff and members of the Class. Defendants' conspiracy systematically raised their profits earned from dealing FFBs at the expense of their customers – investors who traded FFBs with Defendants and who were repeatedly overcharged and underpaid due to Defendants' anticompetitive conduct.

12.     Defendants' alleged agreement to restrain trade in the FFB market is one of many instances of unlawful collusion and price-fixing in the various financial markets in which many of these same Defendants purported to compete during the Class Period. Plaintiffs believe that additional evidentiary support for their allegations will be revealed after a reasonable opportunity for discovery, particularly given the widespread and secretive nature of many of the Defendants' anticompetitive conduct and the DOJ's ongoing criminal investigation.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under the Sherman Act, 15 U.S.C. §1, the

Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1331.

14.     This Court has personal jurisdiction over each Defendant because, as alleged below,

a substantial part of the events giving rise to Plaintiff's claims occurred in this District and the

United States. Defendants' conspiracy was directed at, and had the intended effect of, causing

injury to persons residing in, located in, or doing business in this District and throughout the United

States. Defendants conspired to fix the prices of FFBs that Defendants traded in this District and

with customers located in the United States. Defendants' price-fixing conspiracy harmed investors

in this District and throughout the United States by causing them to pay more for their FFB

purchases and receive less on their FFB sales than they would have in a competitive market.

Defendants, themselves or through their subsidiaries as agents, purposefully availed themselves of

doing FFB business in the United States and in this District by, inter alia: (a) enacting their

conspiracy here to manipulate the prices of FFB transactions with investors in this District and

throughout the United States; and (b) collecting unlawful overcharges from investors in this

District and throughout the United States. Defendants' conduct was within the flow of, and had a

substantial effect on, the interstate commerce of the United States, including in this District.

15.     Venue is proper in this District pursuant to 15 U.S.C. § 15, 22, and 26, as well as

pursuant to 28 U.S.C. §1391(b), (c) and (d). During the Class Period, each Defendant resided,

transacted business, was found, or had agents in this District. A substantial portion of the events

or omissions giving rise to Plaintiff's claims occurred in this District, and a substantial portion of

the affected interstate trade and commerce discussed herein has been carried out in this District.

## PARTIES

16.     Plaintiff International Association of Heat and Frost Insulators and Allied Workers Local No. 14 Pension and Health and Welfare Funds ("Plaintiff") is a pension fund and health and welfare fund administered on behalf of the International Association of Heat and Frost Insulators and Allied Workers Local No. 14, with headquarters in Philadelphia, Pennsylvania. Throughout the Class Period, Plaintiff participated in FFB transactions on the secondary market directly with Defendants Bank of America, N.A., Barclays Capital Inc., Deutsche Bank AG, Deutsche Bank Securities Inc., and Goldman Sachs & Co. LLC. As a result, Plaintiff was injured by Defendants' unlawful and anticompetitive conduct.

17.     **Bank of America/Merrill Lynch:**  Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association incorporated in Delaware and headquartered in Charlotte, North Carolina. BANA is a wholly-owned subsidiary of Bank of America Corporation. Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a Delaware Corporation with its principal place of business in New York, New York. Merrill Lynch is a wholly-owned subsidiary of Bank of America Corporation and a corporate affiliate of BANA. Merrill Lynch acts as a broker-dealer in the purchase and sale of various financial instruments, including FFBs throughout the United States and in this District. Merrill Lynch is the primary broker-dealer for the Bank of America Corporation corporate family, including BANA, and prices, markets, and sells FFBs on behalf of BANA.

18.     During the Class Period, Plaintiff purchased and/or sold FFBs directly with BANA.

19.     **Barclays**:  Defendant Barclays Bank PLC is a British public limited company and multinational financial services corporation headquartered in London, England.  Barclays Bank PLC provides investment banking advisory services, foreign exchange securities lending, and loan

syndication services through at least three offices in the United States, including this District. Barclays Bank PLC's macro market line of business is supported by trading desks that specialize in dealing FFBs.

20.     Defendant Barclays Capital Inc. ("BCI") is a Connecticut corporation with its headquarters in New York, New York.  BCI is a wholly-owned subsidiary of Barclays Bank PLC and engages in investment banking, wealth management, and investment management services. BCI is the main U.S. broker-dealer entity for the Barclays group of entities. Its activities include transactions in asset-backed securities, agency mortgage-backed securities, debt securities, other corporate related securities, equities, resale and repurchase agreements, securities lending and borrowing, and clearing derivative products. BCI conducts FFB-related activities throughout the United States and in this District, including FFB dealing with investors, as part of Barclays Bank PLC's "Barclays Investment Bank" division.

21.     During the Class Period, Plaintiff purchased and/or sold FFBs directly with BCI.

22.     **BNP Paribas**: Defendant BNP Paribas Securities Corp. ("BNP Securities") is a Delaware corporation with its principal place of business in New York, New York, and an indirect, wholly-owned subsidiary of BNP Paribas S.A. BNP Securities is a primary dealer in U.S. government securities and an approved dealer for both Fannie Mae and Freddie Mac. During the Class Period, BNP Securities traded FFBs with investors in the United States from offices located in this District.

23.     **Citigroup**: Defendant Citigroup Global Markets Inc. ("CGMI") is a New York corporation with its headquarters in New York, New York, and a wholly-owned dealer-subsidiary of Citigroup, Inc. CGMI provides investment banking and financial advisory services, including equity and debt financing, asset transaction, private equity, underwriting, institutional sales and

trading, and mergers and acquisitions advisory services. As part of its business, CGMI transact in FFBs with investors from offices located in this District.

24.     **Credit Suisse**: Defendant Credit Suisse AG ("CS AG") is organized under the laws of Switzerland with its principal place of business located in Zurich, Switzerland, and is a wholly-owned subsidiary of Credit Suisse Group AG. CS AG is a multinational banking and financial services company which engages in banking, finance, consultancy, and trading activities in the United States and worldwide. CS AG has a primary U.S. office located in New York, New York referred to as "Credit Suisse AG, New York Branch." Credit Suisse AG, New York Branch ("CS NY") is a legal and operational extension of CS AG in the United States and is not a separately incorporated entity. CS NY is a primary dealer in U.S. government securities and trades with the Federal Reserve Bank of New York in this District in agency debt, which includes FFBs. Through its New York Branch, CS AG serves as a dealer in U.S. government and agency securities, including FFBs.

25.     Defendant Credit Suisse Securities (USA) LLC ("CS Securities") is a Delaware corporation with its principal place of business in New York, New York, and is a wholly-owned subsidiary of CS AG. CS securities is a broker-dealer, providing capital raising, market making, advisory, and brokerage services. It is an underwriter, placement agent, and dealer for money market instruments, mortgage and other asset-backed securities, as well as a range of debt, equity, and other convertible securities of corporations and other issuers. In November 2017, CS Securities transitioned its primary dealer license and a substantial portion of its U.S. Government and Agency Primary Dealership, secondary market trading, and repo market making to CS NY. CS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB dealing inventory that it used in transactions with investors.

26.    **Deutsche Bank**:  Defendant Deutsche Bank AG ("DB AG") is a German financial services company headquartered in Frankfurt, German.  DB AG is a multinational bank that provides services in commercial banking, investment banking, and retail banking, as well as wealth and asset management products to corporations, governments, institutional investors, small and medium-sized businesses, and private individuals. DB AG engages in U.S. banking activities directly through its New York branch, which is based in this District. It also operates in this District through its U.S.-based subsidiaries including Deutsche Bank Securities Inc.

27.    Defendant Deutsche Bank Securities Inc. ("DB Securities") is a Delaware corporation with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Deutsche Bank AG. DB Securities provides capital raising, market making, and brokerage services for governmental, financial institution, and corporate clients. DB Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory to trade with investors. During the Class Period, DB Securities employed trading and sales staff who priced, marketed, and dealt FFBs from within this District.

28.    During the Class Period, Plaintiff purchased and/or sold FFBs directly with DB AG and DB Securities.

29.    **First Tennessee**: Defendant First Tennessee Bank, N.A. ("First Tennessee") is a financial services company based in Memphis, Tennessee. First Tennessee operates a division known as FTN Financial Capital Markets that transacts in FFBs with institutional investors.

30.    **FTN Financial Securities Corp.**: Defendant FTN Financial Securities Corp. ("FTN Financial") is a wholly owned subsidiary of First Tennessee and operates as part of First Tennessee's FTN Financial Capital Markets division. FTN Financial is one of the largest underwriters of FFBs and dealt FFBs to institutional investors.  FTN Financial performed FFB

business in this District with the knowledge and consent of, for the benefit of, and under some control by First Tennessee.

31.     During the Class Period, either independently and/or through FTN Securities Corp., First Tennessee priced, marketed, and dealt FFBs to investors in this District during the Class Period.

32.     Both First Tennessee and FTN Financial comprise First Tennessee's FTN "Financial Capital Markets division." As such, First Tennessee and FTN Financial conduct mutual and related FFB-related activities. For example, First Tennessee participates in syndicates, as defined below, acquiring FFBs in the primary market. FTN Financial transacts in FFBs with investors, selling and trading FFBs in the secondary market that First Tennessee underwrites in the primary market.

33.     **Goldman Sachs**: Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") is a New York corporation with its principal place of business in New York, New York, and a wholly-owned subsidiary of Goldman Sachs Group Inc. Goldman Sachs is a registered broker-dealer with the SEC and trades financial products in all 50 states and the District of Columbia. Goldman Sachs is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory. During the Class Period, Goldman Sachs employed FFB trading and sales staff based in the United States and in this District, who priced, marketed, and dealt FFBs to investors.

34.     During the Class Period, Plaintiff purchased and/or sold FFBs directly with Goldman Sachs.

35.     **JPMorgan**: Defendant JP Morgan Chase Bank, N.A. ("JP MNA") is a federally chartered national banking association with its principal place of business in New York, New York, and a wholly-owned "principal subsidiary" of JP Morgan Chase & Co. JP MNA provides

various banking and other financial services to corporate, institutional, and governmental clients. During the Class Period, JP MNA traded FFBs from within this District.

36.     Defendant J.P. Morgan Securities LLC ("JPMS"), previously known as J.P. Morgan Securities Inc., is a Delaware limited liability company with its headquarters in New York. It is a wholly owned and principal subsidiary of JPMorgan Chase & Co., which is also the parent company of JP MNA. JPMS acts as a primary dealer in U.S. government securities, makes markets in FFBs, and clears over-the-counter derivative contracts in connection with its corporate affiliates' market-making and risk management activities. JPMS is an approved dealer for both Fannie Mae and Freddie Mac, providing access to FFB inventory through the FFB Issuance Process,as defined below, that JPMS and its affiliates, including JP MNA, use when dealing FFBs to investors. During the Class Period, JPMS dealt FFBs from offices located in this District.

37.     **UBS**: Defendant UBS Securities LLC ("UBS Securities") is a Delaware limited liability company with its principal place of business in New York, New York, and is an indirect, wholly-owned subsidiary of UBS AG. UBS Securities provides a full range of investment banking services, including trading and sales and prime brokerage operations. UBS Securities is an approved dealer for both Fannie Mae and Freddie Mac, ensuring access to FFB inventory through the FFB Issuance Process. During the Class Period, UBS Securities priced, marketed, and dealt FFBs to investors from offices located in this District.

38.     **Dealer Defendants:**  Defendants BCI, BNP Securities, CGMI, CS Securities, DB Securities, FTN Financial, Goldman Sachs, JPMS, Merrill Lynch, and UBS Securities are approved dealers for debt securities issued by both Fannie Mae and Freddie Mac.  During the Class Period, these Defendants had access to FFB supply through the FFB Issuance Process, which they

used to acquire FFB inventory on the primary market to deal to investors on the secondary market. These Defendants are collectively referred to as "Approved FFB Dealer Defendants."

39.   **Other conspirators:**  Various other entities, persons, firms, and corporations that are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

## SUBSTANTIVE ALLEGATIONS

## I.   BACKGROUND

### A.   Government Sponsored Entities

40.   Government-sponsored enterprises ("GSEs") are financing entities created by Congress to fund loans to certain groups of borrowers such as homeowners, farmers, and students. Through the creation of GSEs, the Federal government has sought to address various public policy concerns regarding the ability of members of these groups to borrow sufficient funds at affordable rates. GSEs are also sometimes referred to as federal agencies or federally sponsored agencies. Although there are organizational differences among various GSEs, all are established with a public purpose: Student Loan Marketing Association (Sallie Mae), Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac) are privately owned corporations, while the Federal Home Loan Banks and the Federal Farm Credit Banks are systems comprising regional banks. All GSE debt is sponsored but not guaranteed by the federal government, whereas government agencies such as Government National Mortgage Association (Ginnie Mae) are divisions of the government whose securities are backed by the full faith and credit of the United States. To conduct their lending business, GSEs have significant

funding requirements. While many are stockholder-owned companies that can raise equity capital, most GSEs rely primarily on debt financing to fund their day-to-day operations. Among the most active issuers of debt securities are: Federal Home Loan Banks, Freddie Mac, Fannie Mae, Federal Farm Credit Banks, Sallie Mae and Tennessee Valley Authority.

41.    Buyers of GSE-issued debt securities typically include domestic and international banks, pension funds, mutual funds, hedge funds, insurance companies, foundations, other corporations, state and local governments, foreign central banks, institutional investors and individual investors.

42.    The allegations in this Complaint and the alleged conspiracy relate to Defendants' conduct regarding the secondary market for Fannie Mae and Freddie Mac FFBs only.

**B.    Freddie Mac**

43.    Freddie Mac is a GSE organized as a stockholder-owned corporation established by Congress in 1970 to provide a continuous flow of funds to mortgage lenders, primarily through developing and maintaining an active nationwide secondary market in conventional residential mortgages. Freddie Mac purchases a large volume of conventional residential mortgages and uses them to collateralize mortgage-backed securities. Freddie Mac is a publicly held corporation; its stock trades on the New York Stock Exchange

**C.    Fannie Mae**

44.    Fannie Mae is a federally chartered, but privately owned, corporation which traces its roots to a government agency created in 1938 to provide additional liquidity to the mortgage market. Today, Fannie Mae carries a congressional mandate to promote a secondary market for conventional and FHA/VA single- and multifamily mortgages. Fannie Mae is a publicly held company whose stock trades on the New York Stock Exchange.

45.     Fannie Mae and Freddie Mac are "government-sponsored entities" ("GSEs"). GSEs are privately run enterprises sponsored by the Federal government and established for a public purpose. Congress created Fannie Mae and Freddie Mac to provide liquidity, stability, and affordability in the national residential mortgage market. They provide liquidity (ready access to funds on reasonable terms) to banks and mortgage companies that make residential mortgage loans to consumers with the goal of making mortgage loans more affordable for consumers.

46.     Fannie Mae and Freddie Mac finance operations by, among other things, issuing FFBs. FFB issuances occur several times a month, typically in a predictable pattern based on a pre-determined calendar. The great majority of newly issued FFBs have similar or identical characteristics as existing FFBs except that they mature on a later date. The most recently issued FFBs are known as "on-the-run" FFBs, while all other, older FFBs with similar characteristics are known as "off-the run" FFBs.

47.     Each FFB issue is identified with a unique nine-digit alphanumeric code known as a Committee on Uniform Security Identification Procedures number ("CUSIP number"). The CUSIP number identifies specific provisions of each bond issue precisely, such as issuer, coupon, issue date, maturity, and call provisions.

**D.     Characteristics of FFBs**

48.     All FFBs have core similarities that distinguish them as a single class of issuances.

1.     Credit Risk

49.     Credit risk is the risk that the obligor of a debt will default on the debt by failing to make required payments to the obligee. Because all FFBs are issued by Fannie May and Freddie Mac their relative "credit risk" is the same or substantially the same. However, FFBs are not without credit risk. Generally, debt securities issued by GSEs – including Fannie Mae and Freddie

14

Mac -- have a high credit quality or, stated differently, a low credit risk. The senior debt of the GSEs is rated AAA/Aaa, while the subordinated debt of Fannie Mae and Freddie Mac is currently rated AA-/Aa -- that is, high, but slightly lower than senior debt of other GSEs. GSE debt tends to benefit from the perception that the GSE is tied to the federal government as institutions established under federal legislation. However, debt securities issued by GSEs, such as Fannie Mae and Freddie Mac, are solely the obligation of their issuer and, unless explicitly stated, do not carry any guarantee by the federal government. Therefore, although they carry high credit rating and low credit risk, debt issued by GSEs such as Fannie Mae and Freddie Mac carry greater credit risk than securities issued by the U.S. Treasury and certain government agencies (*e.g.*, Ginnie Mae), whose securities have the full-faith-and-credit guarantee of the U.S. government. Thus, because Fannie Mae and Freddie Mac carry some credit risk, they carry a yield premium above that of Treasury securities with comparable maturities. The premium varies with market volatility, and with the structure, maturity, and general supply and demand for the particular security.

50.    FFBs are all issued by Fannie Mae and Freddie Mac, and therefore carry substantially similar levels of "credit risk." Certain financial instruments, such as U.S. Treasury bonds and certain GSE bonds, are sometimes referred to as "cash equivalents" because they are issued by the U.S. government or certain of its federal agencies. By contrast, FFBs are not backed by the full faith and credit of the United States government. Therefore, while FFBs carry some greater credit risk than cash equivalents, they are nevertheless perceived as having a very low credit risk owing to their connection to GSEs and the U.S. government. FFBs also have a high credit rating because, as of September 2008, in the aftermath of the Financial Crisis, the Federal Housing Finance Agency became the conservator of Fannie Mae and Freddie Mac.

2.    FFB Trading and Pricing

51.    FFBs are neither regulated nor registered issuances.  They are exempt from the registration and disclosure provisions of the federal securities laws. Because FFBs are not regulated or registered, they trade "over-the-counter;" financial instruments that are not traded on a national exchange are said to trade over-the-counter.

52.    The over-the-counter market for FFB trading is effectively established, maintained, and operated by the Defendants. Each Defendant operates a trading desk specializing in FFBs. The Defendants' FFB trading desks both sell and trade FFBs.  The individuals on each Defendants' FFB trading desks both trade and sell all types of FFBs. Because the Defendants' employees segregate neither by sales and trading functions nor by the various types of FFBs that their desk staff transacts in, the same staff determines investor pricing for trades and sales across all FFB types.

53.    FFBs also have certain common features including face value, maturity, and coupon payment.  "Face value" is the amount the issuer must pay to the bondholder at maturity, also known as "par." A "maturity date" is the date when the principal amount of a bond, note or other debt instrument is repaid, i.e., the "maturity," to the investor along with the final interest payment. The "coupon" or "coupon rate" is the interest payment made on a bond, usually paid twice a year. For example, a $1,000 bond paying $65 per year has a $65 coupon, or a coupon rate of 6.5 percent. Bonds that pay no interest are said to have a "zero coupon," also called the coupon rate. The coupon on most FFBs is "fixed," meaning that the FFB pays a pre-determined and set rate of interest, known as a "fixed coupon," on a periodic basis and has a fixed maturity. Fixed FFBs, if held to maturity, preserve their principal and offer certainty of cash flow absent a default. At maturity, Fannie Mae or Freddie Mac pays the FFB holder the face value specified in the FFB. Collectively,

these characteristics are used to determine an FFB's "yield to maturity," which is the annual return that the holder of an FFB earns from the instrument.

54.     FFB prices, like bond prices generally, should move inversely with interest rates. As bond prices increase, bond yields fall. Assume an investor purchases a bond that matures in five years with a 5% annual coupon rate and a face value of $1,000. Each year, the bond pays 5%, or $50, in interest. Its coupon rate is the interest divided by its par value. If interest rates rise above 5%, the bond's price should fall if the investor decides to sell it. For example, if interest rates for similar investments rise to 10%, the original bond still only makes a coupon payment of $50, which would be unattractive to investors who can buy bonds that pay $100 once interest rates are higher. If the original bond owner wants to sell the bond, the price can be lowered so that the coupon payments and maturity value equal a higher yield above the original 5%. In this case, that means the investor would lower the price of the bond.

55.     If interest rates were to fall in value – a "falling rate environment" - the bond's price would rise because its coupon payment is more attractive to an investor. If interest rates were to rise – a "rising rate environment" – the bond's price would fall because its coupon is less attractive to an investor.

56.     Fannie Mae and Freddie Mac issue a variety of debt securities with maturities across the yield curve. FFBs can be divided among "long term," "medium-term" and "short-term" and can be "callable" or "non-callable." Long-term FFBs bear maturities greater than 10 years. Medium-term FFBs bear maturities of between 2 and 10 years. Long-term and medium-term FFBs can offer periodic coupons. By contrast, "short-term FFBs do not offer coupon payments. Rather, short-term FFBs are issued by Freddie and Fannie at a discount to the FFBs' stated face value. Rather than a coupon, short-term FFBs pay interest to purchasers when the FFB is redeemed at

maturity. Thus, the purchaser pays, for example, 5% less than the face value of the FFB and, upon maturity, is paid the purchase price plus the amount of the 5% discount.

57.    Most FFBs are non-callable, also known as "bullet" bonds. Callable FFBs have three main characteristics: maturity date, lockout period, and the type of call feature. The maturity date of a callable debt instrument refers to the latest possible date at which the security will be retired and principal will be redeemed. Lockout period refers to the amount of time for which a callable security cannot be called. For example, with a 10 non-call 3-year ("10nc3") FFB, the FFB cannot be called for the first three years. Call feature refers to the type of call option embedded in a callable security of which there are three types, American-style callable (continuous call feature after an initial lockout period), Bermudan-style callable (callable only on coupon payment or other specified dates after the conclusion of the initial lockout period), and European-style call feature (call option can only be exercised by the issuer on a single day at the end of the initial lockout period).

58.    As discussed, the prices at which FFBs are quoted to investors on the secondary market are generally established by the employees of Approved FFB Dealers who sit on their trading desks. Because FFBs are not traded on an open exchange, but rather over-the-counter, Approved FFB Dealers send their price quotes to investors without disclosing their price quotes to the larger investing public, i.e., a "dark market."

59.    Approved FFB Dealers, including Defendants, generally quote FFB prices as a "bid-ask spread." A "bid" price is the price at which the Approved FFB Dealer providing the quote is willing to buy the quoted FFB from its customer. The "ask" price is the price at which the Approved FFB Dealer providing the quote is willing to sell the quoted FFB to its customer. Approved FFB Dealers profit by purchasing FFBs at a lower price and selling at a higher price.

Therefore, the wider the bid-ask spread, the larger a Defendant's profit in an FFB transaction. In turn, the wider the bid-ask spread, the higher the cost for investors such as Plaintiff and members of the Class which thereby lowers their investment return or increases their investment loss.

60.     Liquidity is the degree to which an asset or security can be quickly bought or sold in the market without affecting the price of the asset at issue. As such, liquidity is, in part, driven by the transaction volume in the market for a particular asset. Liquidity is a substantial factor that should determine bid-ask spreads for FFBs. Thus, bid-ask spreads should have an inverse relationship with the level of liquidity in the market. That is, as liquidity increases, bid-ask spreads should become narrower, reflecting the lower risk that the Authorized FFB Dealer may be required to hold the FFB (and, therefore, assuming the risk of a decline in future value), while it searches for a buyer that will pay a price that will yield the Authorized FFB Dealer a larger profit.

61.     The cost associated with this risk is known as the "liquidity premium." In competitive over-the-counter bond markets, liquidity is such a strong determinant of the bid-ask spread that it is often used as a "proxy" for bond market liquidity.

62.     In competitive over-the-counter bond markets, dealers compete against each other by offering superior prices to customers in order to secure business. Competition keeps bid-ask spreads within a relatively narrow range, since any dealer that unilaterally quotes inferior prices to customers will lose business to competitors.

63.     Transactions for FFBs between Approved FFB Dealers on the secondary market are typically conducted by telephone, messaging, or person-to-person. Therefore, pricing in the secondary market for FFBs is opaque and deprives investors, such as Plaintiff and the Class, of real-time quotes. In the absence of real-time quotes, Plaintiffs and members of the Class could not reliably evaluate the competitiveness of the prices quoted by Approved FFB Dealers.

64.     Approved FFB Dealers profit from trading FFBs with investors by keeping the difference between the price that the Approved FFB Dealer pays to purchase an FFB and the price at which the Approved FFB Dealer sells an FFB to a customer.  As the largest Approved FFB Dealers, Defendants profit by dealing FFB inventory to customers in the primary and secondary markets.  Defendants' ability to transact with Plaintiff and the Class in a dark market enabled them to enhance profits through anti-competitive means.

### E.     The Market for FFBs

65.     Investors, such as Plaintiff, generally do not participate in the FFB Issuance Process because Fannie Mae and Freddie Mac generally do not sell FFBs directly to investors. Rather, investors invest in FFBs by transacting with Approved FFB Dealers, such as Defendants.

66.     Fannie Mae and Freddie Mac issue FFBs though either a "syndication" process or auctions. Syndication refers to the underwriting of an FFB issuance by a subset of Approved FFB Dealers (the "syndicate"). Typically, medium-term and long-term FFBs are issued through a syndicate. Together, the syndicate agrees to purchase newly issued Freddie Mac or Fannie Mae FFBs which members of the syndicate then sell to investors such as Plaintiff and members of the Class. By contrast, short-term FFBs are issued through auctions in which only Approved FFB Dealers can purchase them. Approved FFB Dealers who purchase FFBs at auction can then sell them to investors in the secondary market.  FFB syndications and FFB auctions, as discussed in this paragraph, are collectively referred to herein as the "FFB Issuance Process."

67.     Approved FFB Dealers, after participating in a syndication or auction, may, in turn trade FFBs with investors in the secondary over-the-counter market. Each Defendant was an Approved FFB Dealer during the Class Period. Plaintiff and members of the Class, in turn, purchased FFBs from Defendants. Approved FFB Dealers can also trade FFBs with one another;

those FFBs can then be traded with investors, such as Plaintiff and members of the Class, in the secondary market.

68.     Approved FFB Dealers have the opportunity to earn a profit from their participation in the FFB Issuance Process and then selling FFBs to investors such as Plaintiff and members of the Class. Because the FFB Issuance Process is limited to Approved FFB Dealers, the supply of FFB supply is highly concentrated among Defendants.

69.     When members of a syndicate first sell newly issued FFBs directly to other FFB dealers on the day of offer before the FFBs are declared "free to trade," these sales are said to occur in the primary market.

70.     Following the termination of a syndicate and the new issue is declared free to trade, secondary market trading has commenced. Defendants control the secondary market for the sale of newly issues FFBs to Plaintiff and members of the Class. The secondary market includes sales by investors to Approved FFB Dealers of previously issued FFBs that had been declared to trade and trading in the secondary market. Such transactions in the secondary market may include FFBs that an investor has elected to sell before the issue reaches maturity as well as investors' purchases of older FFB issues. The DOJ Fraud and Antitrust Divisions have initiated an investigation into price- fixing by dealers in the FFB secondary market, such as Defendants.

**F.     Defendants Controlled the Supply of FFBs During the Class Period**

71.     Defendants control the majority of the primary market for FFBs because they purchase a substantial proportion of FFBs from Fannie Mae and Freddie Mac during the Class Period. As such, Defendants control a large portion of the supply for the secondary market of syndicated (i.e., medium-term and long-term FFBs) and auctioned, i.e., auctioned FFBs.

Defendants likewise handle the majority of the volume of older FFBs traded in the secondary market.

72.     During the Class Period the Approved FFB Dealer Defendants were among the 10 largest FFB underwriters in the United States. Each underwrote more than $28 billion in FFBs during the Class Period. Collectively, Defendants controlled the majority of the supply of the secondary FFB market and possessed the power to abuse their dominant position to artificially inflate and fix the prices of FFBs that they sold to Plaintiff and members of the Class during the Class Period. For example, Defendants controlled the 64% of the market for syndicated FFBs that entered the secondary market, underwriting $486 billion of FFBs during the Class Period, as follows:

**Defendants' Share of FFB Underwriting**
**March 1, 2010 through April 27, 22014**

| Defendant | FFBs Underwritten |
|---|---|
| BCI | $87 billion |
| UBS Securities | $58 billion |
| JPMS | $57 billion |
| DB Securities | $52 billion |
| CGMI | $51 billion |
| BNP Securities | $45 billion |
| CS Securities | $42 billion |
| First Tennessee National Bank Association | $38 billion |
| Goldman Sachs | $32 billion |
| Merrill Lynch | $28 billion |

| Defendant | FFBs Underwritten |
|---|---|
| Total Underwritten by Defendants | $486 billion |
| Total Underwritten | $759 billion |
| Defendants' share of FFB Underwriting | 64.1% |

73.     The high degree of concentration in the primary market gave Defendants substantial control over the FFB supply available to investors in the secondary market. It also gave Defendants the ability to fix the prices that investors paid for FFBs, and the motive and opportunity to fix FFB prices to generate enormous FFB trading profits.

## II.     DEFENDANTS CONSPIRED TO FIX FFB PRICES CHARGED TO INVESTORS

### A.     The DOJ Is Conducting a Criminal Price-Fixing Investigation into the FFB Market

74.     On June 1, 2018, *Bloomberg* reported that the Department of Justice is investigating whether traders at banks coordinated with one another to benefit the institutions for whom they worked by manipulating the prices that dealers in the FFB market charged to investors. Significantly, confidential sources close to the investigation have told *Bloomberg* reporters that the Department of Justice's investigation is criminal in nature.

### B.     Features of the FFB Market Fostered Collusion Among Defendants

75.     The unique characteristics of the FFB market make it highly susceptible to collusive activity. These include, but are not limited to, Defendants' dominant collective market share, institutional incentives to cheat, high barriers to entry, limited non-dealer access to pricing and trade information, and close social and professional ties among FFB traders.

76.     There is a high level of industry concentration in the FFB market. Defendants are a small number of competitors who controlled the supply of FFBs available to investors through

their dominant share in the FFB Issuance Process. Defendants as a bloc dominated control of FFB supply and were well- positioned to use that dominant position to fix the prices that investors paid for FFBs. Defendants' dominant collective market share gave them the motive and opportunity to fix FFB prices to generate enormous FFB trading profits.

77.     Fannie Mae and Freddie Mac awarded underwriting privileges to Defendants based on Defendants' performance in the secondary market. This provided Defendants with an institutional incentive to conspire to raise and fix prices in the secondary market.

78.     There are high barriers to entry into the FFB market. It is expensive to become an Approved FFB Dealer, and few banks can bear the costs and risks associated with carrying sufficient FFB inventory to serve as a dealer in the FFB market. Changes in prevailing interest rates and other factors can affect the value of FFBs held in a dealer's inventory, limiting the ability of smaller banks to engage in large FFB trades or hold FFB inventory. These barriers to entry prevented non-cartel members from competing with Defendants' cartel and enhanced the efficacy of Defendants' anticompetitive collusion.

79.     In an over-the-counter market, such as the market for FFBs, investors lack access to real-time pricing data. Because investors have little visibility into the market, they have virtually no practical ability to compare or negotiate prices with Defendants. The opaqueness of the FFB market allowed Defendants to charge fixed prices without revealing their conspiracy to their customers.

80.     Because investors trade FFBs over-the-counter rather than on an exchange, investors are forced to transact with market-maker dealers and, in the process, reveal their identities and the details of the transactions they seek to conduct. This dynamic provides dealers with the

ability to mishandle and share confidential information entrusted to them by their counterparties to influence prices to the benefit of the dealers and detriment of their customers.

81.     Markets such as the FFB market are also susceptible to the manipulative practice known as "painting the tape." Using this technique, dealers buy and sell securities among themselves, building a record on TRACE (a FINRA-created database that reports over-the-counter secondary market transactions) to create the illusion of substantial trading activity at certain prices.

82.     Customers in an over-the-counter market typically contact only a limited number of dealers before transacting. Furthermore, the time required to navigate the over-the-counter process provides dealers with the opportunity to communicate and collude with one another before an order is executed.

83.     Defendants' access to trade data also provided Defendants a mechanism to monitor compliance with their price-fixing agreement by checking other cartel members' FFB transactions.

84.     Lastly, the FFB traders and sales personnel employed by Defendants are a small, highly interconnected group. They were well-acquainted with each other and had pre-existing relationships based on time spent working together within Defendants' FFB businesses, sometimes dating back to prior overlapping employment. Many price-fixing conspiracies in financial markets in recent years demonstrate that traders who formerly worked together often function as conduits through which price-fixing agreements develop.

**C.     Economic Analysis Confirms the Existence and Impact of Defendants' Conspiracy**

85.     Economic theory and statistical analysis are consistent with a price-fixing conspiracy that successfully inflated the prices that investors paid when buying FFBs and deflated the prices investors received when selling FFBs throughout the Class Period.

86.     On April 27, 2014, the Financial Times and Reuters reported that DOJ criminal prosecutors were travelling to London to question FX traders. This was in addition to the multiple government investigations into collusion and price-fixing by Defendants and their corporate parents in numerous financial markets since 2012. These government investigations disclosed that Defendants had inadequate compliance and oversight measures during the Class Period in their respective trading and sales businesses. As a result of the various government investigations, fines, and criminal prosecutions, Defendant implemented new compliance and oversight measures, and after news broke in April 2014 confirming that criminal prosecutions would not be limited to LIBOR, FFB prices suddenly and dramatically changed compared to the Class Period.

1.     Defendants Fixed the Prices of Newly Issued FFBs

87.     Statistical analysis of FFB pricing data show that the prices that Defendants charged investors inflated prices for newly issued FFBs soon after FFB issuances. Consequently, investors like Plaintiff and the Class overpaid for FFBs during the Class Period.

88.     In a competitive market, the difference between the price that Defendants paid to purchase FFBs from Fannie Mae or Freddie Mac on newly issued FFBs and the price that Defendants then charged to investors for these same newly issued FFBs should be small. This is so because new additional market information, such as interest rates or Fannie Mae or Fannie Mac's credit worthiness or liquidity, does not factor into the price of the newly issued FFB, as Defendants sell the newly issued FFBs immediately upon issuance.

89.     Two different analyses show that Plaintiff and the members of the Class paid higher prices for newly issued FFBs on offer days prior to April 27, 2014 than they paid after this time. First, the average price FFB dealers charged to customers (investors) was compared to the auction price paid by FFB dealers to Fannie Mae and Freddie Mac during the Class Period and a period of

time after April 27, 2017. Then, those auction date measures were averaged for the Class Period and the after period. This analysis found that the average difference between prices paid by FFB dealers and the prices charged to Plaintiff and the Class on the same offer were significantly higher during the Class Period than after April 27, 2014.

90.     A second way to examine whether competition among Defendants increased after April 27, 2014 is to compare FFB dealers' offer date price spreads on customer trades to price spreads on trades with other FFB dealers. Comparing price spreads for customers with price spreads for other FFB dealers eliminates the need to account for market conditions (other than collusion), because both the customer spreads and other dealer spreads should be equally affected by those market conditions. For purposes of this analysis, the average customer price spread is calculated as the difference between the average FFB dealer sale price to customers on each offer date and the average buy price from customers on that date.  Then the average FFB dealer price spread for trades with other FFB dealers is calculated as the difference between the average sale price to other FFB dealers and the average buy price from other FFB dealers on the offer date. Finally, the difference between the average customer spread and average other FFB dealer spread on each offer date is determined (e.g., a customer spread of 0.023 minus other dealer spread of 0.002 equals a difference of 0.021).  The average of these offer date spread differences before April 27, 2014 was many multiples higher than the average of the spread differences after April 27, 2014.

91.     Under both statistical analyses the prices that Defendants charged investors for newly issued FFBs on offer days was substantially higher before April 27, 2014 than after. The substantial decrease in the prices of newly issued FFBs after the Class Period would not have been observed in a competitive market.

27

2.      <u>Plaintiff's analysis also demonstrates that the price inflation for newly issued FFBs persisted for the five business days after offer days.</u>

92.      Additional statistical analysis also demonstrates that the price inflation for newly issued FFBs persisted for the five business days after offer days.

93.      For each of the five business days following an FFN auction, the average sale price to customers was calculated and then the difference between the daily average sale price paid by customers and the price that dealers paid at that FFN at auction was calculated.  The overall 5-day average difference for FFNs auctioned before April 27, 2014 was much higher than the difference for FFNs auctioned after April 27, 2014. This analysis suggests that prices paid by Plaintiff and the Class were artificially inflated during the Class Period.

94.      The results described above indicate that Defendants were responsible for the artificially wide bid-ask spreads quoted to investors, including Plaintiffs, during the Class Period.

**D.      Similar Wrongdoing in Other Markets Supports the Plausibility of Defendants' Manipulation of FFB Prices**

95.      Defendants' conduct in this case is part of a larger set of revelations emerging about similar manipulation, collusion, and other anticompetitive conduct uncovered in various financial markets. Indeed, many of these same Defendants, along with numerous other dealer banks, have been implicated in or found liable for price-fixing schemes involving other financial products and benchmarks during the Class Period. Government investigations into these schemes have uncovered significant deficiencies in compliance and oversight systems within Defendants' sales and trading businesses during the Class Period. Further, the methods employed to fix prices in these markets—communications between competing traders through telephone, electronic chatrooms, and instant messaging—are strikingly similar to those employed by Defendants as alleged here.

96.     In several instances, certain of the Defendants have pled guilty to the anticompetitive conduct. In other instances, certain of the Defendants have been fined for, or settled claims relating to, alleged anticompetitive conduct. These admissions not only demonstrate a pattern of repeated conduct, but demonstrate more generally the existence of a corporate culture wherein the Defendants are ready and willing to violate the law and collude with one another whenever they deem it necessary to preserve or illegally enhance profits. This history and culture of collusion further demonstrates the inherent plausibility of the conspiracy alleged herein.

97.     Government investigations coordinated between agencies from the United States, the United Kingdom, the European Union, Canada, and Japan have revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies during the Class Period, including the U.S. Dollar LIBOR, Euribor, Yen LIBOR, and Swiss franc LIBOR. These investigations have resulted in criminal and regulatory charges and civil lawsuits against numerous banks, including fines and settlements for price fixing by Bank of America Corporation (parent company of Defendants BANA and Merrill Lynch), Barclays PLC, Citigroup Inc., DB AG, JPMorgan Chase & Co. (parent company of Defendants JP MNA and JPMS), and UBS AG (parent company of Defendant UBS Securities). Regulators have concluded that these banks engaged in widespread misconduct during the Class Period, which included failing to detect and prevent anticompetitive conduct by trading and sales staff within their subsidiaries. The investigations found that trading staff within these banks routinely coordinated false submissions by panelists to the benchmark-setting panel, shared customer and order information, and manipulated market prices by submitting false orders.

98.     Multiple Defendants here failed to control or detect rampant misconduct amongst their trading staff in the foreign exchange market during the Class Period.  These inadequate

oversight measures allowed Defendants' traders to communicate with each other daily, exchanging confidential customer information and coordinating their trading strategies to manipulate foreign currency benchmark rates and prices in  private electronic chat rooms with names like "The Cartel," "The Mafia," "The Club," "The Bandits' Club," "The Dream Team," "One Team, One Dream," and "The Sterling Lads." To date, the Department of Justice's Antitrust Division has issued $3 billion in criminal fines and obtained guilty pleas against the following banks for failing to adequately monitor anticompetitive conduct in their trading businesses: Citicorp. (a wholly owned, direct subsidiary of Citigroup Inc., parent company of Defendant CGMI), Barclays PLC (parent company of Defendants Barclays Bank PLC and BCI), BNP Paribas USA Inc. (subsidiary of BNP Paribas, S.A., parent company of Defendant BNP Securities), JPMorgan Chase & Co. (parent company of Defendants JP MNA and JPMS), and UBS AG (parent company of Defendant UBS Securities). These pleas followed a series of orders from the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency, and the UK Financial Conduct Authority, totaling over $4 billion in fines. In addition, Defendant CS AG has been charged by the European Commission with engaging in "anti-competitive practices" related to manipulation of FX benchmarks. Defendants CS AG, DB AG, and Goldman Sachs Group, Inc. (parent company of Defendant Goldman Sachs) have entered into Consent Orders regarding their FX trading with the New York Department of Financial Services.

99.      Government investigations by the Department of Justice, the Commodity Futures Trading Commission, and European Regulators have also identified deficient compliance and oversight functions at Defendant banks which allowed traders to systematically manipulate the ISDAfix benchmark during the Class Period.  These banks include BANA, Barclays Bank PLC, BCI, BNP Securities, Citibank, N.A. (a wholly-owned subsidiary of Citigroup, Inc., parent of

Defendant CGMI), DB Securities, Goldman Sachs, and JP MNA, among others. The private civil action resulted in over $500 million dollars in settlements.

100.    Ongoing investigations by the Department of Justice, the UK Financial Conduct Authority, and the European Commission have similarly uncovered collusion in the supranational, sovereign, and agency bonds ("SSA bonds") market.  The investigations include allegations that SSA traders at different banks agreed on prices and shared information on certain bonds in private electronic chat rooms. The private civil action, originally filed in May 2016, was amended in April 2017 to include 10 banks (originally filed against five) and hundreds of redacted chats and transcripts that demonstrated that these banks failed to oversee collusive communications by trading and sales staffs in their bond businesses.

## III.   ANTITRUST INJURY

101.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have been injured in their business and property.  Due to Defendants' conspiracy, Plaintiff and the Class were overcharged each time they purchased FFBs from Defendants and underpaid each time they sold FFBs to Defendants.

102.    Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

(a)     Competition in the secondary market for FFBs has been artificially restrained;

(b)     FFB prices and bid-offer spreads charged to Plaintiff and the Class have been fixed or stabilized at supra-competitive levels; and

(c)     Plaintiff and the Class have been deprived of the benefit of free and open competition in the market for FFBs.

103.   Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## IV.   CLASS ACTION ALLEGATIONS

104.   Plaintiff brings this action individually and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:[3]

> All persons or entities who transacted in Fannie Mae or Freddie Mac bonds during the period of at least January 1, 2009 through April 27, 2014 (the "Class Period") with a Defendant, where such persons or entities were domiciled in the United States or its territories.  Excluded from the Class are the Defendants and any parent, subsidiary, affiliate, employee, agent or co-conspirator of any Defendant.[4]

105.   The members of the Class are so numerous that joinder of all members is impracticable. Although the precise number of Class members is currently unknown, Plaintiff believes that at least thousands of geographically dispersed Class members transacted in FFBs during the Class Period at artificial prices due to Defendants' conspiracy.

106.   There are multiple questions of law and fact common to the Class that predominate over any questions affecting individual members of the Class, including but not limited to:

> (a)   whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of FFBs during the Class Period;

> (b)   the identities of the participants of the alleged conspiracy;

> (c)   the duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

---

[3] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, the Class Period.
[4] The Class definition does not include transactions in which a party purchased an FFB directly from Fannie Mae or Freddie Mac.

(d)    whether the alleged conspiracy violated the Sherman Act, 15 U.S.C. § 1;

(e)    whether the alleged conduct of the Defendants and their co-conspirators caused injury to the business or property of Plaintiff and the members of the Class;

(f)    whether such injury or the fact or extent of artificiality in FFB prices caused by Defendants' conduct may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

(g)    whether Plaintiff and the members of the Class had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(h)    whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and members of the Class

(i)    the appropriate measure of damages; and

(j)    the appropriate injunctive and related equitable relief.

107.    Plaintiff's claims are typical of those of the class it seeks to represent because they all sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

108.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests that are antagonistic to those of absent Class members. Plaintiff has retained counsel highly experienced in class action litigation, including antitrust class action litigation concerning collusion in financial markets.

109.    Adjudicating the claims of Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent adjudications, thereby establishing incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

## V.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

110.    Throughout the Class Period, Defendants knowingly, fraudulently, and deliberately concealed their conspiracy from Plaintiff and members of the Class.

111.    Defendants fraudulently concealed their anticompetitive activities, by among other things, engaging in secret communications in furtherance of their conspiracy.  Concealment of the secret communications between Defendants was an essential element of the conspiracy to manipulate FFB prices.  Defendants communicated through non-public chat rooms, phone calls, instant messages, text messages, email, and at in-person meetings, none of which are or were reasonably available to Plaintiff or members of the Class.

112.    Defendants' conspiracy relied on secrecy for its successful operation. Defendants knew that they could not subject their collusive conduct to public scrutiny, and therefore agreed among themselves not to publicly discuss or otherwise reveal the nature and substance of the acts and communications in furtherance of the conspiracy.

113.    Defendants also actively concealed their violations of law from Plaintiff and the Class by (i) implicitly representing that the FFB pricing quotes Defendants supplied to Plaintiff and the Class were the product of honest competition and not fixed by a conspiracy; and (ii)

affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws.

114.    On June 1, 2018, Bloomberg published an article reporting that four confidential sources revealed that the DOJ Antitrust Division is conducting a criminal investigation into collusion among dealers to fix FFB prices. To Plaintiff's knowledge, this was the first public report concerning Defendants' price manipulation in the FFB market.

115.    As a result of Defendants' efforts to conceal their conspiracy, Defendants successfully prevented Plaintiff from being able to learn of the facts needed to bring suit against Defendants for conspiring to manipulate the market for FFBs.    Because of Defendants' concealment, Plaintiff and the Class were not aware of Defendants' misconduct and could not have discovered it through the exercise of due diligence until at least June 2018, when the DOJ's price-fixing investigation was first revealed publicly.

116.    Because Defendants fraudulently concealed their conspiracy in deliberate efforts to prevent Plaintiff and members of the Class from commencing suit, any applicable statute of limitation affecting or limiting the rights of action by Plaintiff or the Class have been tolled. Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (Against All Defendants)

117.    Plaintiff incorporates each allegation above as if fully set forth herein.

118.    Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

119.    During the Class Period, Defendants controlled the supply of FFBs available to investors and were horizontal competitors in the FFB market.

120.    Defendants, by and through their officers, directors, employees, agents, or other representatives, engaged in anticompetitive activities, the purpose and effect of which were to fix, maintain, and charge artificial prices for FFBs to investors.

121.    The combination and conspiracy consisted of a continuing agreement, understanding, and concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and charged artificial prices for FFBs to investors.

122.    The alleged contract, combination, or conspiracy is a *per se* violation of the Sherman Act.

123.    There is no legitimate business justification for, or procompetitive benefit caused by, Defendants' unreasonable restraint of trade. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

124.    Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. These injuries included, but were not limited to, paying artificial and non-competitive prices for FFBs as a proximate result of Defendants' anticompetitive conduct. Plaintiff and the Class were also deprived of the benefits of free and open competition in the FFB market.

125.    Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

126.    Defendants' conspiracy and resulting impact on FFB prices paid by investors occurred in and affected U.S. interstate commerce.

127.    Plaintiff and members of the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged herein, as well as an injunction preventing and restraining Defendants from engaging in additional anticompetitive conduct.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment in Violation of the Common Law**
**(Against All Defendants)**

128.    Plaintiff incorporates each allegation above as if fully set forth herein.

129.    Through their unlawful conduct, Defendants were unjustly enriched at the expense and to the detriment of Plaintiff and members of the Class.

130.    Defendants' collusion enabled them to collect supra-competitive profits on every transaction of FFBs with Plaintiff and members of the Class.

131.    Defendants' collusion caused Plaintiff and members of the Class to pay more (in the case of FFB purchases) and receive less (in the case of FFB sales) on their FFB transactions with Defendants.

132.    Plaintiff's and Class member's detriment and Defendants' enrichment are traceable to, and resulted directly and proximately from, the conduct challenged in this Complaint.

133.    Under these circumstances, the financial benefits that Defendants derived from their illegal conduct constitutes unjust enrichment as Defendants have no right to the benefits that were obtained through their collusion.

134.     It would be inequitable for Defendants to be permitted to retain the benefit which they obtained through their illegal acts and at the expense of Plaintiff and members of the Class.

135.     Plaintiff and the Class therefore seek restoration of the monies of which they were unfairly and unlawfully deprived as described in this Complaint.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

A.     That the Court determine that the claims alleged herein are suitable for class treatment and certify the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3);

B.     That the Court appoints Plaintiff as the representative of the Class;

C.     That Plaintiff's counsel be appointed as counsel for the Class;

D.     That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

E.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

F.     That judgement be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law;

G.     That Plaintiff and the Class recover their costs of the suit, including attorneys' fees and expert fees;

H.     That Plaintiff and the Class be awarded pre- and post-judgment interest on all sums awarded; and

I.      For such other and further relief as is just and proper under the circumstances.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a jury trial as to all issues triable by a jury.

Dated: March 25, 2019                             Respectfully submitted,


                                                  */s/ Daniel J. Walker*
                                                  Daniel J. Walker, NY Bar No. JW1716
                                                  **BERGER MONTAGUE PC**
                                                  2001 Pennsylvania Avenue, NW, Suite 300
                                                  Washington, D.C. 20006
                                                  (202) 559-9740 telephone
                                                  (215) 875-4606 facsimile
                                                  dwalker@bm.net

                                                  Michael Dell'Angelo
                                                  Michael J. Kane
                                                  Mark R. Suter
                                                  **BERGER MONTAGUE PC**
                                                  1818 Market Street, Suite 3600
                                                  Philadelphia, PA 19103
                                                  (215) 875-3000 telephone
                                                  (215) 875-4604 facsimile
                                                  mdellangelo@bm.net
                                                  mkane@bm.net
                                                  msuter@bm.net